UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| 3600 MICHIGAN CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:07-CV-367-PPS |
| | ) | |
| | ) | |
| INFRA-METALS, CO. f/k/a PREUSSAG | ) | |
| INTERNATIONAL STEEL | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This is a commercial dispute about the lease of an industrial property in East Chicago, Indiana. Defendant Infra-Metals seeks to exclude the testimony of Jeffrey Vale, plaintiff 3600 Michigan's expert appraiser [DE 58]. An evidentiary hearing was held that explored Vale's qualifications, the nature of his expertise, and the bases for his proposed testimony. For the reasons discussed below, Infra's motion is **GRANTED in part** and **DENIED in part**.

## BACKGROUND

This dispute concerns an industrial property in Northwest Indiana, located at 3600 Michigan Road, East Chicago, Indiana, where the parties and their respective predecessors jointly operated a steel processing facility from 1992 to 1997 [DE 1]. In 1997, Infra agreed to terminate the joint venture with 3600; transfer ownership of the property to 3600, and lease it back from 3600 for a ten-year period, from 1997 to 2007 [*Id*.].

Six years into the lease, Infra notified 3600 of its decision to vacate the property and cease making further rental payments [DE 2-2]. As a result, the parties negotiated a 2003 amendment to the lease, which progressively reduced Infra's rent over the four years remaining

in the lease period. The idea was that the parties were to cooperate with one another and use reasonable efforts to locate a new tenant for the four-year period remaining on Infra's lease [DE 1 & 1-4]. Unfortunately for Infra, no new tenant was found so Infra continued to pay the rent on a property it did not even occupy, albeit at the lower rate negotiated in the lease amendment.

Shortly after the July 2007 termination of the lease, 3600 sued Infra for breach of the lease and the amendment, including for Infra's alleged failure to fulfill certain obligations under those agreements [DE 1]. Infra counterclaimed, alleging that 3600 had breached its duty under the lease amendment to use reasonable efforts to locate a new tenant [DE 2-2]. Infra points to the fact that 3600 managed to secure a new tenant, oil giant BP, roughly six months after the July 2007 termination of Infra's lease. According to Infra, this was no coincidence. Infra says that 3600 simply sat back and happily collected rental payments while Infra was still on the hook and only sought to re-lease the property after the proverbial golden goose died. These are the allegations, anyway.

3600 claims that it acted in good faith and made reasonable efforts to find a replacement tenant but the market was simply in the tank and no one could be found. To support this defense, 3600 hired expert appraiser Jeffrey Vale to opine in part about the difficult market conditions in the industrial real estate market during the relevant period of time. In particular 3600 proffered Vale to give opinion testimony on (1) the condition of the industrial real estate market in East Chicago, Indiana for the 2003-07 time period; and (2) the reasonableness of 3600's asking price for the subject property during this period. 3600 also seeks to introduce Vale's lay testimony as to the condition of the subject property during this same period.

Infra moved to exclude Vale's opinion and lay opinion testimony in its entirety on

several grounds, including that the proposed opinion testimony is deficient under *Daubert* and Rule 702's relevance and reliability standards [DE 58 & 59]. Infra later withdrew Vale's proposed opinion testimony as to the reasonableness of 3600's asking price [DE 60], leaving only the issues of Vale's proposed opinion testimony on market conditions, and his proposed lay opinion testimony, to be resolved in the present motion.

## DISCUSSION

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 113 (1993). *See Lewis v. Citgo Petroleum Corp*., 561 F.3d 698, 705 (7th Cir. 2009). Rule 702 provides, in relevant part, that "[i]f scientific, technical or other specialized knowledge will assist the trier of fact[,] . . . a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion . . . ." Fed. R. Evid. 702. The Rule "also requires that: (1) the testimony must be based upon sufficient facts or data; (2) it must be the product of reliable principles and methods; and (3) the witness must have applied the principles and methods reliably to the facts of the case." *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 824 (7th Cir. 2010).

Under this framework, this Court must act as a gatekeeper for expert testimony, determining prior to admission whether the testimony is both relevant and reliable. *U.S. v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009); *U.S. v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005); *Dhillon v. Crown Controls Corp*., 269 F.3d 865, 869 (7th Cir. 2001). In conducting this inquiry, I must focus solely on principles and methodology, not on the conclusions they generate. *Winters v. Fru-Con Inc*., 498 F.3d 734, 742 (7th Cir. 2007); *Chapman v. Maytag Corp*., 297 F.3d 682,

687 (7th Cir. 2002). "The goal of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

To assess reliability, the Court must determine whether the expert is qualified in the relevant field, and whether his reasoning or methodology is valid. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (citing *Kumho*, 526 U.S. at 153); *see also Parra*, 402 F.3d at 758.

An expert may be qualified to render opinions based on experience alone. *See Kumho Tire Co.*, 526 U.S. at 156; *Walker v. Soo Line R.R. Co*., 208 F.3d 581, 591 (7th Cir. 2000). Indeed, "[i]n certain fields, experience is the predominant, if not the sole basis for a great deal of reliable expert testimony." Advisory Committee Notes to Rule 702. As the Seventh Circuit has emphasized, "genuine expertise may be based on experience or training." *U.S. v. Conn*, 297 F.3d 548, 556 (7th Cir. 2002) (quoting *Tyus v. Urban Search Mgmt*., 102 F. 3d 256, 263 (7th Cir. 1996)); *Trustees of Chicago Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan Trust Funds v. Royal Intern. Drywall & Decorating, Inc.*, 493 F.3d 782, 787-88 (7th Cir. 2007). Accordingly, a court should consider a proposed expert's full range of practical experience when determining whether the expert is qualified to render an opinion in a given area. *See, e.g., Smith*, 215 F.3d at 718.

But whether a witness is qualified as an expert depends on whether his area of expertise extends to the subject matter of his proposed testimony. *See Carroll v. Otis Elevator Co*., 896 F.2d 210, 212 (7th Cir. 1990). As the Seventh Circuit has explained, even "[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are . .

. reliable and relevant under the test set forth by the Supreme Court in *Daubert*." *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999).

In determining the relevance of the proposed testimony, the court "must consider whether the testimony will assist the trier of fact with its analysis of any of the issues involved in the case." *Smith*, 215 F.3d at 719. To satisfy this requirement, the expert need not have an opinion on the ultimate question to be resolved by the trier of fact. *See Walker*, 208 F.3d at 587. Rather, "[a]nyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness." *Tuf Racing Prods. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 593 (7th Cir. 2000).

**I.     Vale's Opinion Testimony on Market Conditions**

Infra challenges both the reliability and relevance of Vale's proposed testimony on market conditions. Specifically, Infra argues that this testimony is unreliable because (1) it is not based on sufficient data; and (2) it fails to comply with the Uniform Standards of Professional Appraisal Practice (USPAP), which is evidently the Bible in the appraiser business [DE 59]. Infra further argues that the proposed testimony is irrelevant because it consists of information that is both publicly available and well-known to residents of East Chicago [DE 62 at 7-8].

**A.     Vale's Qualifications**

The first question is whether Vale is qualified to be an expert in this case. He plainly is. Vale has been a licensed general appraiser in Indiana since 1991 – the year licensing for appraisers came into effect in Indiana – a licensed certified appraiser since 1992, and a practicing appraiser for 21 years [DE 59-2 at 8-9]. He is also an independent broker licensed in Indiana, and a Member of the Appraisal Institute (MAI) in Chicago, Illinois [*Id.*]. He has been qualified

as an expert in approximately 20 cases involving real estate appraisal issues [*Id.*].

Vale testified that he has performed thousands of appraisals of commercial and industrial properties over the course of his 21-year career. He focuses his practice in the appraisal of commercial and industrial properties. He estimated that, of the thousands of appraisals that he has done over the years, about 75-80% have been for industrial and commercial properties. And Vale's appraisal practice specializes in the Northwest Indiana real estate market, which includes East Chicago where the subject property is located. Vale testified that, as an appraiser of industrial and commercial properties, he has a general familiarity with the process of marketing such properties, including how long such properties tend to remain on the market before they are sold or leased.

Infra does not seriously challenge Vale's qualifications, and nor could they. I therefore find that Vale's extensive experience qualifies him to give opinion testimony in this case. Specifically, his experience as an appraiser for commercial and industrial properties in East Chicago allows him to speak to the market conditions for leasing such properties there during the 2003-07 time period, which is relevant to resolving the dispute at the heart of Infra's counterclaim – namely, whether 3600 used reasonable efforts during that period to locate a replacement tenant for the subject property.

**B.      Validity of Vale's Methodology**

The next issue is whether Vale's methodology is valid. Vale's expert report [DE 59-2] includes a number of conclusions relating to the condition of the East Chicago real estate market for industrial properties during the 2003-07 period. For convenience, and based on Vale's testimony during the December 6, 2010 hearing, I will summarize these as follows:

6

(1)     Leasing large industrial properties became difficult in 2002-03 due to the bankruptcies, and massive transformation and consolidation, in the domestic steel industry.

(2)     During 2002-03, there was a roughly 50% vacancy rate for industrial space in East Chicago, with 2.5-3 million square feet available for lease.

(3)     Rent concessions were made during 2002-03 to retain tenants in this market.

(4)     Demand for industrial properties began to recover in 2005, but it has taken several years for the available supply to be absorbed by the market.

(5)     A marketing time of one-to-two years for leases of large industrial properties, even after the 2005 partial recovery, was common during this period.

In drawing these conclusions, Vale testified that he relied on his own experience as an appraiser in the Northwest Indiana industrial real estate market, and on discussions with a number of other individuals with firsthand knowledge of this market – principally, Dick Weiss and Howard Cyrus, who Vale described as the leading real estate brokers and appraisers for industrial properties in Northwest Indiana. Vale has known and worked with Weiss and Cyrus since he started in the appraisal business 21 years ago. Vale also interviewed John Tubbs, another industrial real estate broker, who worked for Commercial Advantage when that company was the listing agent for the subject property.

Vale also relied on discussions with Ed Auten, an owner of an East Chicago company that services the steel industry, and Sharon Rankin, an owner of industrial properties in East Chicago and Hammond during the relevant period. Vale further consulted with Don Koliboski, an East Chicago city official who oversaw economic development in that City during his 2002-03 tenure with East Chicago's Department of Redevelopment. As Vale explained, East Chicago city officials had referred him to Koliboski as a person with knowledge of the economic conditions in East Chicago for the relevant period.

Vale testified that he relied on his conversations with Cyrus, Weiss and Koliboski in reaching opinions (1) and (2). As for opinion (3), Vale relied on his discussions with Cyrus and Weiss. As for opinion (4), Vale relied on his conversations with Weiss, Cyrus and Tubbs, along with BP's press release in 2005 that it would undertake a $3 billion expansion in Whiting, IN. And Vale relied on his conversations with Cyrus, Weiss and Tubbs, and his own experience with marketing times for large industrial properties, in reaching opinion (5).

Infra argues that these opinions are unreliable because they supposedly run afoul of USPAP. Vale admitted to some uncertainty regarding the extent to which USPAP governs the report he prepared in this case. USPAP, as Vale explained, establishes guidelines and procedures governing the preparation of appraisal reports, appraisal reviews and appraisal consulting. But as Vale also explained, the general market study he performed here does not fit neatly into any of these categories because his report does not provide an opinion of value of the subject property. Nor was Vale asked to provide an opinion of value here, which he testified is generally the purpose of any appraisal. Further, Vale testified that USPAP does not provide specific direction on how to conduct the general market study that undergirds his conclusions here, other than the instruction to follow general appraisal principles in doing a market study. And Vale explained that he complied with that instruction, along with USPAP's standards and guidelines for ethics and client relations. Given Vale's testimony – and the absence any authority showing that Vale was required to comply with USPAP, even though he did not perform an appraisal here – I conclude that the reliability of Vale's methods is not diminished by any extent to which his report does not fit squarely within USPAP's purview.

Infra also challenges the reliability of Vale's interview methods on the ground that he did
8

not rely on any published data, for example, the CoStar and LoopNet databases that tally sales and rental information for industrial and commercial properties. This argument is really one going to the weight of Vale's testimony, not its admissibility. As the Seventh Circuit has stated, "experts in various fields may rely properly on a wide variety of sources and may employ a similarly wide choice of methodologies in developing an expert opinion." *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1020 (7th Cir. 2000). And a number of cases have concluded that interviews can be a reliable source of data upon which to base expert opinion, so long as such data is reasonably relied upon by experts in the relevant field. *See United States v. Lundy*, 809 F.2d 392, 395-96 (7th Cir. 1987) (arson experts regularly rely upon "interviews with many witnesses to a fire" as a "standard investigating technique in cause and origin inquiries"); *U.S. v. Gardner*, 211 F.3d 1049, 1054 (7th Cir. 2000); *In re James Wilson Assocs.*, 965 F.2d 160, 172 (7th Cir. 1992) ("An expert is of course permitted to testify to an opinion formed on the basis of information that is handed to rather than developed by him-information of which he lacks first-hand knowledge and which might not be admissible in evidence no matter by whom presented."); *see also In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 646, 656 (N.D. Ill. 2006).

Vale testified during his deposition that the information he learned about the market from his interviews was consistent, and that he therefore had no reason to supplement or independently verify it with published information [DE 60-1 at 49]. Vale further testified that he is not aware of any published materials that would have confirmed or refuted what he learned through those interviews. What's more, subsequent to giving his deposition in this case, Vale learned that CoStar did not begin to provide figures for the Northwest Indiana market until 2006, and that LoopNet did not do so until 2005. So these databases would have been useless with

respect to Vale's opinions as to market conditions prior to those points in time.

This testimony is itself sufficient to show the reasonableness of Vale's reliance on interviews, as opposed to published materials. *See In re Sulfuric Acid Antitrust Litig.*, 446 F. Supp. 2d 910, 924 (N.D. Ill. 2006) ("Often, the reasonableness of the reliability on third party data is shown through the testimony of experts themselves"). Moreover, Infra has provided no evidence that the interview methods Vale employed are not reasonably relied upon by appraisal experts in forming the type of conclusions regarding market conditions that Vale presents here.

Infra also seeks to challenge the reliability of Vale's methods on the ground that the general market study he performed here was "treading new ground" for him [DE 59 at 3]. Vale conceded that he has never done a stand-alone general market study – that is, a market study that is not provided in connection with a valuation appraisal of a specific property. But he added that a market study is a component of every one of the thousands of commercial and industrial appraisals he has performed. And he explained that the general market study he performed here differs from the market study component of such appraisals only by adding more detail and comprehensiveness, for example, by examining the market in general, rather than as it relates to a specific property, and doing so over a range of several years, as opposed to a specific point in time.

Finally, as referenced above, even if the general market study Vale performed here were, as Infra argues, outside his specific area of experience, that, alone, would not affect the admissibility of the related testimony, only its weight. *See Hawthorne Partners v. AT&T Techs., Inc.*, No. 91 C 7167, 1993 WL 311916, at *3 (N.D. Ill. Aug. 11, 1993) (real estate appraiser could opine on impact of environmental stigma on market value even though he had never

measured such impact before); *see also Tuf Racing Prods.*, 223 F.3d at 593; *Ashland Oil, Inc. v. Delta Oil Prods. Corp.*, 685 F.2d 175, 178 (7th Cir. 1982) (testimony of expert in chemistry was reliable despite lack of expertise in polyurethane chemistry). In any event, the Court is satisfied on the basis of Vale's testimony that the general market study he performed here falls well within the scope of his considerable appraisal experience.

Accordingly, the Court concludes that Vale's methods are sufficiently reliable for him to testify as an expert.

### C.     Relevance of the Proposed Testimony

Infra also argues that Vale's proposed testimony as to market conditions is irrelevant because it consists of publicly available information, which Infra contends is not admissible as the subject of expert testimony [DE 62 at 7-8]. I disagree. While a fact finder may have some general knowledge and an impression about the difficult market conditions in the relevant time period, expert testimony on the topic is certainly more helpful than a general impression.

During voir dire, Vale conceded that his general conclusions about the difficulty in the East Chicago industrial real estate market during the relevant time period would be well-known to East Chicago residents. The same goes for Vale's conclusions as to the causes of this difficulty, such as the consolidation and bankruptcy patterns that took place in the domestic steel industry, beginning in 2002-03.

The relevance of Vale's proposed testimony, however, depends on whether such matters "will assist the trier of fact with its analysis of any of the issues involved in the case." *U.S. v. Hall*, 165 F.3d 1095, 1102 (7th Cir.1999). Here, the 2003-07 market conditions for rentals of industrial properties in East Chicago are relevant to the disputed issue of whether 3600

undertook reasonable efforts to re-lease the subject property during this period. It's obviously harder to unload a property in a down market. Just ask those trying to sell a house today. Indeed, it is difficult to imagine being able to resolve the question presented – Did 3600 use reasonable efforts to locate a replacement tenant? – in a vacuum. Context matters, and the context in this case is the market conditions. So opinion testimony on this subject will certainly assist the Court, which is the fact finder in this bench trial, in determining the reasonableness of 3600's efforts.

Moreover, Infra is incorrect to assume that only information that is inaccessible to the fact finder can come in under Rule 702. As Vale conceded, the general difficulties in the steel industry during the relevant period may be widely-known, and particularly so for residents of East Chicago, whose economy was severely impacted by such difficulties. But the Court is not required to exclude expert testimony "just because the testimony may, to a greater or lesser degree, cover matters that are within the average [person's] comprehension." *Tyus*, 102 F.3d at 263 (quoting *U.S. v. Hall*, 93 F.3d 1337, 1342 (7th Cir. 1996)). And, anyway, there is no evidence that Vale's more specific conclusions as to the impact of the steel industry's transformation on the rental market – opinion (2) concerning the 50% vacancy rate, for example – are within the common knowledge of a layperson.

Accordingly, Vale's proposed opinion testimony on market conditions is not only reliable, but also relevant to the issue of the reasonableness of 3600's efforts to re-lease the subject property.

## II. Vale's Proposed Lay Opinion Testimony

As I mentioned above, 3600 conceded that Vale cannot offer opinion testimony on the reasonableness of 3600's asking price for the subject property. But it still seeks to present Vale's lay opinion testimony as to the condition of the subject property. Federal Rule of Evidence 701 permits lay opinion testimony only if the witness testifies to what he has perceived firsthand. Fed. R. Evid. 701; *see also Conn*, 297 F.3d at 555; *Harms v. Lab. Corp. of Am.*, 155 F. Supp. 2d 891, 904 (N.D. Ill. 2001).

As Vale conceded during voir dire, he had no firsthand experience with the subject property during the 2003-07 period. And by the time he did inspect the property, in May 2008, 3600 had already performed significant repairs to it, in preparation for BP's occupancy. Vale further conceded that the statements in his report concerning the condition of the subject property during the relevant period are assumptions based on verbal reports from others. So any testimony he could give on the condition of the subject property during the 2003-07 time period would not be rationally based on perception, as Rule 701 requires. Instead, it would be rank speculation. Accordingly, Vale will not be permitted to give lay opinion testimony on this topic.

## CONCLUSION

For the foregoing reasons, and the reasons stated on the record during the December 6, 2010 hearing, defendant Infra's motion to exclude Jeffrey Vale's testimony [DE 58] is **GRANTED in part** and **DENIED in part**. Specifically, Mr. Vale will be permitted to give opinion testimony only on the subject of the market conditions for industrial real estate in Northwest Indiana during the 2003-07 period. Mr. Vale will not be permitted to opine on the

13

reasonableness of 3600's asking price for the subject property during this period.  Nor will he be permitted to give lay opinion testimony as to the condition of the subject property during this period.

**SO ORDERED**.

ENTERED: January 3, 2011

/s/ Philip P. Simon  
PHILIP P. SIMON, CHIEF JUDGE  
UNITED STATES DISTRICT COURT